Exhibit 5

**FILED
HIGH COURT
TERRITORY OF
THE VIRGIN ISLANDS**

**Submitted Date:16/04/2021 12:12**

**Filed Date:16/04/2021 12:12**

**Fees Paid:811.84**

THE EASTERN CARIBBEAN SUPREME COURT

VIRGIN ISLANDS

IN THE HIGH COURT OF JUSTICE

COMMERCIAL DIVISION

Claim No BVIHC (Com) 0033 of 2021

BETWEEN

                    **ALIX AM PTE LTD.**                Claimant

and

(1) AGRICULTURE INVESTMENT GROUP CORP (formerly known as UNION AGRICULTURE GROUP CORP)

(2) JUAN JOSE SARTORI PINEYRO (also known as JUAN SARTORI)

(3) UNION GROUP INTERNATIONAL HOLDINGS LIMITED

(4) CAPITAL UNION BANK LTD.

(5) GROW PRODUCTION INC.

(6) CHAMELI LTD

(7) ADVANTEX FINANCE INC.

(8) ARVESA CORP.

(9) CLEMENT DUCASSE

(10) ULTIMATE EMPRESAS LIMITED

(11) TASKMASTERS CORP.

(12) JUAN MARTIN JORGE CANADELL

(13) OSCAR BALTASAR COSTA

(14) OSCAR ALEJANDRO LEON BETANCOR (aka OSCAR LEON)

                                                Defendants

35534092v4

## STATEMENT OF CLAIM

1   The Claimant (**Alix**) is a company incorporated in Singapore, with its Registered Office address at 3 Philip Street # 14-02, Royal Group Building, 048693, Singapore.

2   The First Defendant (**UAG**) is a company incorporated in the British Virgin Islands on 2 January 2008. From its inception, it secured hundreds of millions of dollars' worth of investments through a succession of private placements of its stock, to acquire farms and ranches throughout Uruguay. By 2010, it had become one of the largest "farming corporations" in Uruguay with farming operations in wheat, soybeans, rice, blueberries and cattle on over 15,000 acres of farm and ranch land in Uruguay.

3   UAG has approximately 256 shareholders. Despite requests, the Claimant has not been provided with an up to date copy of UAG's Register of Members, but it understands:

   (i)   The Fourth Defendant (**Capital Union Bank**) to hold 14.78% of the shares issued by UAG

   (ii)   The Fifth Defendant (**Grow Production**) to hold 13.02% of the shares issued by UAG

   (iii)   The Sixth Defendant (**Chameli**) to hold 11.97% of the shares issued by UAG

   (iv)   The Seventh Defendant (**Advantex**) to hold 11.33% of the shares issued by UAG

   (v)   The Eighth Defendant (**Arvesa**) to hold 5.35% of the shares issued by UAG

   (vi)   The Ninth Defendant (**Ultimate Empresas**) to hold 1.75% of the shares issued by UAG

   (vii)   The Tenth Defendant (**Mr Ducasse**) to hold 3.21% of the shares issued by UAG

   (viii)   The Eleventh Defendant (**Taskmasters**) to hold 0.010% of the shares issued by UAG

(ix) The Twelfth to Fourteenth Defendants to be or to have been shareholders in UAG. The Twelfth Defendant was also the ultimate beneficial owner of the Eleventh Defendant as well as the employee of UAG responsible for Notarial and Legal Affairs.

4 The Fourth to the Fourteenth Defendants are joined to these proceedings as significant shareholders of UAG, interested in the outcome of these proceedings. In addition:

(i) The Third Defendant was a significant shareholder in UAG, and it is believed that its shares were held for the benefit of Mr Sartori, with the result that it benefited from and/or participated in the matters set out below; and

(ii) Those other of the Defendants (to include the Sartori Associated Entities) that participated in the schemes pleaded below are liable to the Claimant under Section 184 BVI Business Companies Act 2004 and/or in respect of the conspiracies pleaded.

**Mr Sartori**

5 On 30 May 2008 and until the events pleaded below, the Second Defendant (**Mr Sartori**) served as a director of UAG. In that capacity, he owed UAG duties, which were fiduciary in nature:

(i) To act honestly, in good faith and in the best interests of UAG;

(ii) To exercise his powers for a proper purpose;

(iii) To apply himself to the affairs of UAG with the skill and competence to be expected of a director in his position;

(iv) To heed and to act upon the advice given by professionals, such as accountants, or their refusal to certify as accurate any material valuation;

(v) Disclose to the Board the benefit which he stood to derive, directly or indirectly, from any transaction into which UAG entered.

6 The Twelfth Defendant was employed by UAG as the Head of Legal and Notarial affairs, and he in turn was the sole shareholder of Taskmasters. In addition, directors nominated, directly or indirectly, to the board of UAG by Mr Sartori include:

(i) Oscar Alejandro Leon Betancor (**Mr Leon**) who served during the period 1 April 2013 to 19 April 2018, and for most (if not all) of that period as the Chief Financial Officer of UAG

    (ii)    Oscar Baltasar Costa Martinez who served during the period 18 May 2015 to 19 April 2018, and (from at least February 2014) was its Chief Executive Officer

    (iii)    Francisco Jose Ortiz von Bismark who served during the period 17 May 2017 to 6 December 2018 (**Mr von Bismark**)

    (iv)    Francisco Javier Gutierrez Rivas who was appointed as such on 17 April 2018 (**Mr Gutierrez**)

(the **2018 Sartori Nominees**, and all four together (alongside the Twelfth Defendant) being the **Sartori Nominees**)

7    In each case, they owed duties equivalent to those of Mr Sartori pleaded at paragraph 5 above.

8    Or about April 2011 Mr Sartori is said to have entered into a Service Agreement with UAG (the **Service Agreement**). Pursuant to the terms of that Service Agreement he owed contractual duties to UAG to:

    (i)    Diligently, faithfully and competently serve the interests UAG and to promote the interests of UAG;

    (ii)    He was nevertheless permitted to engage in external activities that were similar in nature to or competitive to the affairs of UAG;

    (iii)    Clause 5.5 of the Service Agreement provided that if his services were terminated without cause or for good reason, then he would be entitled to the Termination Payment therein defined (the **Termination Payment**).

9    In addition to being a member of the board of UAG, at all relevant times, Mr Sartori is believed to have been a significant direct, and indirect, holder of the shares issued by UAG, holding directly or, it is believed, through persons associated with him, in aggregate over 51% of the shares issued by UAG, including (subject to disclosure) through:

    (i)    The Third Defendant (**Union Holdings**):

        (a)    a company of which Mr Sartori was the Chief Executive Officer and Chairman, and in which he held 100% of its issued shares, until he sold 25% of the shares issued by Union Holdings to Dundee Corporation by an agreement witnessed by the Twelfth Defendant and holding a registered office address which was the same as that of Taskmasters;

    (b)    being the entity to which shares in UAG were transferred on 11 May 2015 by Cuthbert Productions Inc (**Cuthbert**), an entity incorporated in Belize, which in turn were transferred to Cuthbert on 5 May 2015 by Iron Capital Corp (**Iron Capital**), in lieu of payment for shares purchased by UAG in Granosur. These shares were ultimately transferred to EFG Bank to hold as nominee.

  (ii)  Entities over which he has direct or is believed to have indirect control, including (but not limited to)

    (a)    the Fourth Defendant (**Capital Union Bank**), a company incorporated in the Bahamas,

    (b)    Grow Production Inc (**Grow Production**), a company incorporated in Belize,

    (c)    Chameli Ltd (**Chameli**), which became a recipient of shares issued by UAG, which had been transferred by Joyce Assets Corp (**Joyce Assets**), those shares having been alooted in lieu of payment to Joyce Assets for its interest in Granosur. Those shares were (again) later transferred to EFG Bank to hold as nominee,

    (d)    Advantex Finance Inc (**Advantex**), a company incorporated in Belize and

    (e)    (after 2017) Arvesa Corp (**Arvesa**).

(each together, alongside any other entity which disclosure might establish to have been owned or controlled directly or indirectly by Mr Sartori, being the **Sartori Associated Entities**)

### Alix's Subscription

10    In December 2010 Alix subscribed to shares which then had a value of US$4.4m, with the result that it now holds 383,333.33 (or about 1%) of the shares issued by the First Defendant (**UAG**) following an (unfulfilled) representation that UAG would be taken public within a year.

11    From its inception until 2013, UAG's business was limited to producing agricultural products – farming and ranching. Its products were stored, transported, exported, and traded through the international agricultural conglomerate, Cargill and Dreyfus.

12    By no later than early 2013, UAG's management, including Sartori, had resolved to develop UAG into a more vertically integrated company, not only producing agricultural products, but also handling internally the logistical, trading and financing services that Uruguayan farms required.

13    Such vertical integration was thought to be more efficient and cost-effective than paying third parties, like Cargill, for such services, but would also provide the opportunity to profit from marketing such services to independently owned Uruguayan farms and ranches.

**The Granosur Transactions**

14    However, while Sartori agreed with the strategic plan to make UAG more vertically integrated, he had plans to accomplish that objective through a scheme that would effectively convert UAG's capital for his own benefit and the benefit of his friends and associates, and in which the Sartori Associated Nominees holding office at the times pleaded below were full participants.

15    The first step in that scheme occurred in early 2013, when an agricultural logistics and trading company, called Granosur Holding Limited (**Granosur**) was incorporated, which was controlled by Mr Sartori and in which he is understood to have had (or acquired) a significant interest. The shareholders of Granosur upon incorporation included Iron Capital, Saville Management Corp (**Saville**), Wealdstone Inc (**Wealdstone**), Joyce Assets and Honeywell Corporation.

16    To the detriment of UAG:

  (i)    Mr Sartori capitalized Granosur in part with debt capital in the form of one or more loans that he caused UAG to make to Granosur, aggregating several million dollars. The loans made by UAG to Granosur were not approved by UAG shareholders.

  (ii)   He then used Granosur's start-up capital, including loans from UAG, to acquire or build storage and transportation facilities.

  (iii)  From Granosur's inception, it operated from UAG offices in Montevideo, at little or no cost to Granosur. Mr Sartori then commanded UAG's CFO to reduce UAG's engagement with Cargill, and to hire Granosur for the storage and logistics of UAG's products.

17    In 2013 and 2014, during all of the foregoing activities, Mr Sartori was, directly or indirectly, a beneficial owner of Granosur's equity. Moreover, at the time, Mr Sartori also served as the Chairman of Gransour.

35534092v4

18  In late 2013, Mr Sartori took the next step in his plan to divert capital from UAG for his own benefit, through the phased acquisition of Granosur at grossly inflated valuations. In transactions that took place in December 2013 and January 2014, Mr Sartori caused UAG to purchase roughly 18% of the outstanding stock of Granosur from one or more of Granosur's "original" shareholders.

19  According to a December 2013 report to UAG shareholders (the **December 2013 Report**), the consideration paid to the selling Granosur shareholders was worth $4.5 million, implying a $25 million valuation of the company. According to the same report, the acquisition of this minority stake "required very little capital as it was mainly executed through earlier loan conversions and cash into" Granosur – thus confirming that Mr Sartori had used UAG assets to fund Granosur's formation and initial infrastructure acquisitions.

20  The December 2013 Report did not disclose to UAG's Shareholders:-

   (i)   Mr Sartori's financial interest in Granosur or his role as its Chairman since inception.

   (ii)  The fact that Granosur had operated from inception from within UAG's corporate office in Montevideo, paying, little or no rent. Rather, the December 2013 report to UAG shareholders misleadingly stated only that, as of December 2013, under a so-called "cooperation agreement" between UAG and Granosur, the latter "will *consider* physically moving its headquarters to our building."

   (iii) Granosur had been formed only eight months earlier, in late April 2013, and so was a start-up with virtually no operational track record. To the contrary, Granosur was described to UAG's shareholders as "a fully integrated Uruguayan grain trading and logistics company" that had experienced "very impressive growth" and was "highly profitable."

   (iv)  The December 2013 report told UAG shareholders that the acquisition of a minority stake in Granosur would be "highly accretive to our operations as we acquired this stake at a very low multiple to EBITDA."

21  In fact, Granosur's income for the partial year ended December 31, 2013 was only about $390,000, suggesting its enterprise value, based on a normal 10x-15x EBITDA multiple, was around $4-5 million at that point – not the $25 million valuation suggested by the consideration paid by UAG for its initial stake in Graanosur.

22  Moreover, at that point, Granosur was not worthy of a typical EBITDA multiple, as it was not only a start-up enterprise, but in addition was almost entirely dependent on UAG for

its business. Thus, in 2013, the overwhelming majority of revenues booked by Granosur are understood to have been derived from processing and trading UAG's agricultural products.

23  In May 2014, Mr Sartori caused UAG to enter into a Share Exchange Agreement with the other Granosur shareholders pursuant to which UAG agreed to purchase from those shareholders another 33% of Granosur's outstanding stock, making UAG the majority (51%) owner of Granosur.

24  UAG paid the sellers with 1,447,086 shares of UAG stock, which at the time was worth about $17 million.

25  This pricing implied a valuation of Granosur in May 2014 of more than $51 million – more than twice the already inflated valuation that was basis for the initial acquisition only 5 months earlier.

26  Furthermore, UAG's attempts (through Mr Sartori and/or the Sartori Nominees then holding office) to secure the assistance of a Big 4 accountancy firm to warrant the accuracy of that valuation floundered. Notwithstanding the fact that not one of those practices were prepared to do support the accuracy of the valuation, and in breach of the duties pleaded at paragraph 5 above owed Mr Sartori and/or the Sartori Nominees then holding office, UAG entered into the Share Exchange Agreement regardless.

27  Furthermore or alternatively, to the extent that it might be alleged that an alternative valuation was obtained (none being admitted) it will be the Claimant's case that the alternative valuation was inflated by unrealistic modelling and/or information provided to that valuer, and that UAG and its directors knew, or ought to have known, that the valuation therein could not be relied upon.

28  The terms of the Share Exchange Agreement also included options for UAG (a call option) and the sellers (a put option) pursuant to which UAG could elect, or be compelled, to purchase the remaining 49% of the outstanding stock in Granosur at the same valuation, within twelve months, i.e., by May 2015.

29  In the five months between UAG's initial acquisition of an 18% stake in Granosur and May 2014 when UAG acquired another 33% of Granosur's outstanding shares, Granosur had not attracted many, if any, customers other than UAG. That is, the overwhelming majority of Granosur's business continued to be the trading and transportation of UAG products.

30      In truth, by May 2014, Granosur had developed no good will, and had no value beyond the net liquidation value of its tangible assets – which had been acquired or developed in part with debt capital loaned to it by UAG.

31      Mr Sartori obtained the UAG board's consent to the May 2014 Share Exchange Agreement by concealing his interests in Granosur (which also deprived UAG shareholders of their right under UAG's governance documents to vote on the proposed transaction), and by misrepresenting the economics of the transaction to the board of directors, especially its two supposedly independent directors.

32      At the time of the May 2014 Share Exchange Agreement, Sartori was serving as the Chairman of Granosur, and, it is believed, held a significant beneficial interest in its stock. But in the presentation to the UAG board recommending approval of the Share Exchange Agreement, none of that was disclosed to the independent directors of UAG.

33      Moreover, Sartori's presentation of the proposed transaction stated that the Share Exchange Agreement would result in increases in UAG revenues and EBITDA of 28% and 32%, respectively, at a cost of only 3% dilution of existing UAG shareholders. In fact, however, the projected increases in revenues and EBITDA required exercise of the put/call options contained in the Share Exchange Agreement, and would therefore correspond to a 7% dilution of UAG shareholders.

**The Option**

34      A put/call option in the May 2014 Share Exchange Agreement (the **Option**) was exercised by UAG in February and March 2015, as a result of which UAG acquired another 49% of Granosur's outstanding shares, becoming its 100% owner.

35      The Claimant understands that UAG's acquisition of the remaining 49% of Granosur's shares was again accomplished by means of a stock swap, and again was based on the grossly inflated $51 million valuation given to Granosur in May 2014.

36      In preparation for that transaction, but undisclosed to the board or to the members of UAG, Saville Management and Wealdstone both transferred their shareholding in Granosur to Taskmasters on 3 September 2014, which were then ultimately transferred (like the shares of Chameli and the Third Defendant) to EFG Bank to hold as nominee.

37      Mr Sartori had effectively transferred around 12% of UAG's equity capital to the shareholders of Granosur, a start-up company that owed its existence to and was sustained only by UAG revenues, and did so without disclosing to UAG's independent directors, much less its shareholders, that he was Chairman of Granosur and would derive

financial benefits from UAG's acquisition of Granosur shares. He did so through a series of offshore entities, which it is to be inferred he owned or controlled, with the shares then becoming vested in him beneficially.

**The Settlement Agreement**

38  In early 2018, Sartori was still a controlling shareholder in UAG and therefore controlled the composition of the board of directors.

39  By April 2018, Sartori had resolved to enter Uruguayan politics and run for elective office. His intention to do so led him, in turn, to plan his purported separation from all positions with UAG.

40  The terms of Sartori's Service Agreement provided that, if he voluntarily resigned his position as UAG Chairman or if UAG terminated him for "cause," he would receive no severance, whereas if UAG terminated him without cause or he resigned "for good reason," he would become entitled to a cash severance payment aggregating millions of dollars.

41  Mindful of those terms, and intending to obtain millions of dollars more from UAG despite his own desire to terminate his employment by UAG to serve his political objectives, Mr Sartori schemed to use his control over UAG to arrange for his termination by the company purportedly without cause:

   (i)  First, on April 19, 2018, he caused a majority of the UAG shares to vote in favour of removing him and several of his long-time associates from the board of directors, and at the same time to install a new three person board, two members of which – namely Mr von Bismark and Mr Gutierrez were friends and associates willing to accommodate his severance objectives (the **2018 Sartori Nominees**).

   (ii) Second, the very next day, the two new board members that were Sartori's associates signed a resolution to remove Mr Sartori and the other removed directors from any other managerial positions with the company.

    (iii)    Third, on 27 April 2018, the new directors caused UAG to enter into a so "Settlement Agreement" (the **Settlement Agreement**) pursuant to which Mr Sartori agreed to resign all positions he held with UAG (including as its Chairman under the 2011 Services Agreement), and UAG agreed to make a termination payment to him in the amount of US$3,301,370.00, based on a "Termination Without Cause."

42    These steps were taken notwithstanding the fact that:

    (i)    In March 2012, UAG issued a Private Placement Memorandum which warranted that Mr Sartori was incapable of being removed, except by a special resolution of 80% of UAG's shareholders. UAG has asserted that this document forms part of the shareholders' bargain with UAG;

    (ii)    The Settlement Agreement was being entered into with a "Related Party" and therefore was an agreement which required the approval of Significant Shareholders pursuant to Article 131(f) of the Articles of Association; and such approval was not sought or obtained.

    (iii)    There is a logical inconsistency in the dismissal of Mr Sartori without cause, and the Board's resolution that his removal was in the "best interests" of UAG.

43    Upon their appointment, the Sartori Nominees owed like duties to those pleaded at paragraph 5 above.

44    Prior to entering into the Settlement Agreement, Mr Sartori, in breach of fiduciary duties owed to UAG, concealed from UAG's new board the facts and circumstances described above respecting his scheme to convert a large percentage of UAG capital by orchestrating the acquisition of Granosur at wildly inflated valuations, all while concealing his financial interest and management role in Granosur.

45    Had Mr Sartori disclosed the Granosur affair to UAG's board in 2018, UAG's board – even the two new members that were handpicked by Sartori in 2018 – could not lawfully, and consistently with their duties as directors of UAG, accommodated Mr Sartori's desire to receive millions in severance by characterizing the termination of his employment as UAG Chairman as "without cause."

46    Rather, if Sartori had disclosed the truth about the Granosur acquisition, UAG's board would have terminated him for cause, and he would have received no further compensation.

**Unfair Prejudice**

47  Without the intervention of this Court, it is likely that the affairs of UAG will continue to be conducted in a manner which is oppressive, unfairly prejudicial or discriminatory to the Claimant in its capacity as a member.

**The April 2021 AGM**

48  Already, the Sartori Nominees are proposing to convene a board meeting, for the purposes of convening a shareholders meeting at which (inconsistently) it is proposed to:

(i)  To approve a share repurchase program;

(ii)  To amend the Memorandum and Articles of Association of the Company according to a proposal presented to shareholders;

(iii)  To liquidate the assets of the Company and to distribute the proceeds to its shareholders;

(iv)  To make all necessary steps to complete a Going Public Transaction within the next twelve months;

(v)  To implement a Spin-off Strategy with Company's subsidiaries to its shareholders

(the **AGM Proposals**).

49  For the most part, these proposals appear to be designed to squeeze out or to dilute dissentient shareholders such as the Claimant or to bring about a transfer of the more valuable assets of UAG.

50  The Claimant has a single nominee on the board of UAG, Mr Jérome Ferracci. In each case, those proposals appear to have been made by a select cabal of shareholders close to the associates of Mr Sartori currently holding office, who have declined:

(i)  To provide further information to the Claimant to enable those proposals to be considered;

(ii)  To identify the group of shareholders that are said to have made those proposals;

(iii)  To identify the benefit to the Company in putting those proposals to an AGM.

51  The Claimant reserves the right to plead further to the proposed resolutions in due course.

52      The affairs of UAG have therefore been conducted by the Defendants in a manner which is unfairly prejudicial, oppressive or discriminatory to the Claimant in its capacity as a member of UAG, in particular through:

   (i)    Entering into the transactions by which it acquired shares in Granosur (the **Granosur Transactions**);

   (ii)   Exercising the Option;

   (iii)  Appointing the 2018 Sartori Nominees;

   (iv)   Inducing the 2018 Sartori Nominees to enter into the Settlement Agreement and/or to decline or fail to reclassify Mr Sartori's resignation as being a termination for cause;

   (v)    Making the Termination Payment;

   (vi)   Failing to provide proper, or any, disclosure to the board or to the members of Mr Sartori's interest in the foregoing transactions;

   (vii)  Failing to provide sufficient or any information to Mr Ferracci to enable him to consider whether the AGM Proposals should be put.

**Conspiracy – the Granosur Transactions**

53      The Gransour Transactions were implemented by:

   (i)    The directors of UAG then holding office acting in breach of the fiduciary duties already pleaded;

   (ii)   The Sartori Nominees and/or the Sartori Associated Entities inducing the directors of UAG so to act;

   (iii)  Mr Sartori's failure to disclose his interst in the Granosur Transactions or in the exercise of the Option pursuant to Section 124(7) of the BVI Business Companies Act 2004.

54      The Granosur Transactions formed part of a scheme devised or implemented by Mr Sartori in concert with the Early Sartori Nominees and the Sartori Associated Entities to strip value from UAG. In doing so, they conspired together to cause loss to the Claimant by the unlawful means pleaded at paragraph 49 above and/or with the predominant intention of injuring that class of shareholders (such as the Claimant) that did not also have an interest in Granosur.

### Conspiracy – the Settlement Agreement

55  The Settlement Agreement was entered into:

 (i) For the enrichment of Mr Sartori, in circumstances in which his decision to stand for elected office meant that he was in any event required to resign his position within UAG;

 (ii) Following a resolution of the shareholders, which he engineered, which was not passed in the bona fide best interests of UAG, to remove him from office and to appoint the 2018 Sartori Nominees, who were prepared to enter into the Settlement Agreement for his benefit;

 (iii) In breach of the fiduciary duties of the directors then holding office.

56  It is therefore to be inferred that Mr Sartori, the Sartori Associated Entities and the 2018 Sartori Nominees acted in concert pursuant to a further scheme to strip value from UAG and to enable a payment to be made to Mr Sartori to which he had no entitlement. In doing so, they conspired together to cause loss to the company equivalent to the value of the Termination Payment by unlawful means, namely by:

 (i) The directors of UAG then holding office to act in breach of the fiduciary duties pleaded herein; and

 (ii) Mr Sartori's encouragement or inducement of those directors to act in breach of their duties to UAG and in breach of contract;

 (iii) By the shareholders, aware of Mr Sartori's scheme, passing a resolution otherwise than in the bona fide best interests of the Company and in breach of their equitable duties to the other shareholders.

AND THE CLAIMANT CLAIMS:

 (i) An order that UAG and/or the Sartori Associated Entities shall acquire the Claimants' shares in UAG at a price to be determined by the Court, which takes no account of the value which has been removed from UAG by the Granosur Transactions or the Termination Payment;

 (ii) An order restraining UAG and its directors from engaging in conduct that contravenes the provisions of the BVI Business Companies Act 2004 and its Memorandum & Articles;

 (iv) As against Mr Sartori, the Sartori Nominees and the Sartori Associated Entities, damages for conspiracy;

(v)   Interest thereon;

(vi)  Such further or other relief as the Court thinks fit;

(vii) Costs

**CERTIFICATE OF TRUTH**

I Jérome Jacques Antoine Ferracci, being a director of the Claimant, certify that I believe the facts stated in this Statement of Claim to be true. I am duly authorised to sign this Statement on the Claimant's behalf.

Name: Jérome Jacques Antoine Ferracci
Position: Director

Dated this ___ day of March, 2021

ANDREW WILLINS, Partner
Appleby (BVI) Limited

The Court office is at Road Town, Tortola, British Virgin Islands. Telephone number: 284-468-5001/5153. Fax: 284-468-4951. The Court office is open between 8.30am and 4.30pm on Monday to Friday except on public holidays.

The claimant's address for service is: Andrew Willins, Appleby (BVI) Limited, Jayla Place, PO Box 3190, Road Town, Tortola, British Virgin Islands. Legal Practitioners for the Claimant. Ref: AW.449278.0002.

35534092v4

THE EASTERN CARIBBEAN SUPREME COURT

BRITISH VIRGIN ISLANDS

IN THE HIGH COURT OF JUSTICE

COMMERCIAL DIVISION

Claim No BVIHC (Com) 0033 of 2021

BETWEEN

**ALIX AM PTE LTD.**

**Claimant**

and

**AGRICULTURE INVESTMENT GROUP CORP** (formerly known as **UNION AGRICULTURE GROUP CORP**) and others

**Defendants**

---

**STATEMENT OF CLAIM**

---

**APPLEBY**

**Legal Practitioners for the Claimant**

Tel: +1 284 393 5323
Email: awillins@applebyglobal.com

Ref: AW.449278.0002

35534092v4